**HAHN & HESSEN LLP**
488 Madison Avenue
New York, NY 10022
(212) 478-7200
(212) 478-7400
Joshua I. Divack
Zachary G. Newman
Jacob T. Schwartz
Jose A. Fernandez

*Attorneys for DB 232 Seigel LLC & DB 232 Seigel Mezz LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>232 SEIGEL ACQUISITION LLC<br><br>       Debtor. | Chapter 11<br><br>Case No. 20-22845 (RDD) |

**OBJECTION OF DB 232 SEIGEL LLC**
**TO APPROVAL OF DISCLOSURE STATEMENT**

DB 232 Seigel LLC ("*Senior Lender*"), by and through its undersigned counsel, hereby files this objection (the "*Objection*"), pursuant to section 1125 of chapter 11 of the United States Code (the "*Bankruptcy Code*"), and Rule 3017-1 of the Local Bankruptcy Rules for the Southern District of New York (the "*Local Rules*"), to the approval of the Disclosure Statement (the "*Disclosure Statement*") proposed by 232 Seigel Acquisition LLC ("*Acquisition*") in connection with its Plan of Reorganization (the "*Acquisition Plan*"). In support of the Objection, Senior Lender respectfully submits as follows:

**BACKGROUND**

**A. Pre-Bankruptcy Loans, Default, and UCC Sale**

    1.    Prior to this bankruptcy filing, Acquisition and its debtor-affiliate, 232 Seigel Development LLC ("*Development*", and together with Acquisition, the "*Debtors*"), entered into

certain secured lending transactions (the "*Loans*") with Senior Lender and DB 232 Seigel

Mezz LLC ("*Mezz Lender*", and together with Senior Lender, the "*Lenders*") secured by,

among other things, Acquisition's real property located at 232-244 Seigel Street, Brooklyn,

New York (the "*Mortgaged Property*"), and Development's sole, 100% equity ownership

interest in Acquisition (the "*Senior Borrower Equity Interest*").

2.      On January 1, 2020 (the "*Maturity Date*"), the Loans matured and the Debtors

failed to make any payments due thereunder (the "*Maturity Payment Defaults*").  In response,

on March 3, 2020, Mezz Lender informed the Debtors that it would be pursuing the

foreclosure and public sale of the Senior Borrower Equity Interest pursuant to the applicable

loan documents and section 9-610 of Article 9 of the Uniform Commercial Code enacted in

the State of New York (the "*UCC Article 9 Sale*").  The UCC Article 9 Sale was stayed by these

bankruptcy filings.

**B. Bankruptcy Filings**

3.      On July 14, 2020 (the "*Petition Date*"), the Debtors each filed petitions for relief

under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of New York (the "*Court*").  In its Voluntary Petition for Relief, Acquisition

described itself as being engaged in the business of owning Single Asset Real Estate pursuant

to Bankruptcy Code § 101(51B).

4.      On August 27, 2020, Acquisition filed its Plan [ECF No. 19], and filed its

Disclosure Statement [ECF No. 20] contemporaneously therewith.  Development also filed a

Plan of Reorganization for Small Business under Subchapter V of Chapter 11 on the same

day [case no. 20-22844, ECF No. 22].[1]

5.      Acquisition's Disclosure Statement includes (i) the Acquisition Plan (Exhibit A), (ii) Bidding and Auction Procedures (the "*Bid Procedures*") (Exhibit A to Plan), (iii) a Notice of Sale, (iv) a statement of assets and liabilities and liquidation analysis (Exhibit B), and (v) a Purchase and Sale Agreement, by and between Acquisition and "232 Seigel Property, LLC" (the "*Purchaser*"), dated as of February 26, 2020 (the "*PSA*").   The Disclosure Statement further classifies Senior Lender as "Class 2" with a "first mortgage on the Property" and a secured claim in the amount of $5,250,000, the principal amount of the Senior Loan. Disclosure Statement ¶ 23-25.   Senior Lender is "obligated" to assign its mortgage to the Purchaser's mortgagee in connection with the sale of the Mortgaged Property. *Id.* ¶ 40.   The Disclosure Statement also provides that "[Acquisition] intends to invoke the cramdown provisions of section 1129(b) as to any impaired class that does not accept the plan", but does not provide detail as to the means for Acquisition's cramdown and instead merely recites the standards of section 1129(b). *Id.* ¶¶ 91-94.

6.      The Acquisition Plan contemplates the sale of the Mortgaged Property to the Purchaser free and clear of all liens and interests for $18 million pursuant to the PSA (the "*Sale*").   The PSA contains a time-of-the-essence provision, which required closing to occur by May 21, 2020 (*see* PSA § 2.3), and required the Purchaser to deliver a down payment to Acquisition in the amount of $1.8 million by no later than February 27, 2020 (the "*Down Payment*"). *See* PSA § 2.2.  It appears from both Debtors' Schedules of Assets and Liabilities,

---

[1]  Development's Plan was filed under the provisions of subchapter V of chapter 11 of the Bankruptcy Code. Based upon the $18 million sale of Acquisition's Mortgaged Property pursuant to the PSA, the Acquisition Plan contemplates a $6,202,990 distribution to Development as the sole equity holder of Acquisition (the "Equity Distribution") after full payment to Acquisition's secured, administrative, priority, and general unsecured creditors.   The Lenders' objection to Development's election of subchapter V status is pending before the Court.

Statements of Financial Affairs, and other filings, that the Down Payment either was never made or was subsequently returned to the purchaser. The PSA also provides, among other things, as a condition of closing that Acquisition "has not… (ii) filed any voluntary petition in bankruptcy." *See* PSA § 6.1(c), 12.1.16. The PSA does not contain any provisions that subject the PSA to higher and better offers, an auction process, or bankruptcy court approval.

7.      Acquisition's Plan also contemplates the assumption of the PSA, as well as a market testing of the PSA, through an undefined auction process pursuant to the Bid Procedures. The Bid Procedures generally provide no timeline in connection with the auction and sale process. Among other things, the Bid Procedures do not provide for or propose (i) a timeline or mechanism for marketing the Mortgaged Property or solicitation of interest in the Mortgaged Property, (ii) a bid deadline, (iii) an objection deadline in connection with the Bid Procedures, (iv) an auction date in the event Acquisition receives more than one qualified bid, (v) a tentative sale hearing date, and (vi) a deadline by which interested parties may object to the results of the auction or the sale of the Mortgaged Property to the Successful Bidder.

8.      The Bid Procedures set an $18 million opening bid for the Mortgaged Property, the purchase price set forth in the PSA. While Acquisition has not sought approval from this Court to permit the Purchaser to act as a stalking horse bidder, it appears that Acquisition intends the PSA to be a stalking horse sale agreement. However, given that the PSA was executed long before Acquisition's bankruptcy filing, the PSA does not incorporate terms that allow for a bankruptcy auction and sale process and does not state that the PSA is subject to higher and better offers. The Bid Procedures, through the form purchase and sale agreement attached thereto, appears to require an all-cash purchase. *See* Bid Procedures, Form APA

§ 2.01(B).  The Bid Procedures are silent with respect to Senior Lender's right to credit bid.

9.      On September 22, 2020, the Lenders filed their *Motion of DB 232 Seigel LLC and DB 232 Seigel Mezz LLC for Relief from the Automatic Stay* [ECF No. 30] (the "*Stay Relief Motion*").  By the Stay Relief Motion, the Lenders sought relief from the automatic stay as against both Debtors "for cause" on the grounds that the Debtors had filed for bankruptcy in bad faith, and specifically against Acquisition as a "Single Asset Real Estate" debtor that Acquisition has no reasonable possibility of confirming a plan of reorganization within a reasonable time (*see* Bankruptcy Code § 362(d)(3)).  Among other things, the Lenders asserted (i) they had established a *prima facie* case for relief from the automatic stay in light of the circumstances surrounding the Debtors' bankruptcy filings, (ii) Acquisition's Plan is not confirmable because, among other things, it contemplates the assumption of a non-assumable purchase and sale agreement, and (iii) Development's Plan is not confirmable because it was incorrectly filed under Subchapter V, and it is also not confirmable based upon its dependence upon Acquisition's non-confirmable Plan.

10.     On September 24, 2020, Senior Lender filed a proof of claim (the "*Proof of Claim*") in the Acquisition bankruptcy case in the amount of $6,378,750 (the "*Claim*"), inclusive of principal, pre-petition interest, and certain costs and fees provided for under the relevant loan documents (the "*Senior Loan*").

## OBJECTION

11.     The Disclosure Statement fails to provide adequate information and disclosure regarding the Sale and the Acquisition Plan.  Among other things, the Disclosure Statement fails to provide a satisfactory level of information with respect to (i) the Sale as contemplated by the PSA, including whether the Purchaser intends to move forward with its purchase under

the now-defaulted PSA and participate in a bankruptcy auction and sale process, (ii) the correct amount of Senior Lender's "Class 2" claim, and (iii) the means for implementing the Plan, including an explanation of the procedures outlined in the Bid Procedures, and the timeline for the action, sale and plan confirmation process.

12.    Section 1125 of the Bankruptcy Code requires that a disclosure statement contain "adequate information." *See* 11 U.S.C. § 1125(b).  Section 1125(a) of the Bankruptcy Code provides, in relevant part, as follows:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

11 U.S.C. § 1125(a)(1).  "Of prime importance in the reorganization process is the principle of disclosure" and therefore "[t]he Code obligates a debtor to engage in full and fair disclosure" with respect to its disclosure statement. *Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).  In determining whether a disclosure statement has "adequate information", the court must determine whether the disclosure statement permits a 'hypothetical investor' to make an informed judgment' about whether to vote for or against the proposed plan. *See In re Feldman*, 53 B.R. 355, 358 (Bankr. S.D.N.Y. 1985) (applying "hypothetical investor" standard); *In re 18 RVC, LLC*, 485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012); *see also Krystal Cadillac-Oldsmobile GM Truck, Inc. v. GMC*, 337 F.3d 314, 321 (3rd Cir. 2003) (the term adequate information is that which would enable a hypothetical investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan).  Stated differently, "a disclosure

statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization. A disclosure statement should likewise contain all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization." *In re Ashley River Consulting, LLC*, 2015 Bankr. LEXIS 3819 at *26 (Bankr. S.D.N.Y. 2015) (quoting *In re Cardinal Congregate I*, 121 B.R. 760, 765-66 (Bankr. S.D. Ohio 1990)). "Furthermore, a disclosure statement is intended to be a source 'of factual information upon which one can make an informed judgment about a reorganization plan,' and not 'an advertisement or a sales brochure.'" *Id.* (quoting *In re Egan*, 33 B.R. 672, 676-76 (Bankr. N.D. Ill. 1983)).

### I.   Insufficient Information Regarding the Sale and PSA

13.     As discussed in the Stay Relief Motion, the Lenders have serious concerns regarding the current validity of the prepetition PSA and the Purchaser's intention to move forward with the Sale at the $18 million purchase price. The Disclosure Statement simply fails to provide information on these key issues, and thus should not be approved.

14.     The Disclosure Statement provides very minimal and generally unhelpful information regarding the circumstances and negotiation of the PSA prior to Acquisition's bankruptcy filing, and provides only cursory information about why the Sale was not consummated prepetition. The Disclosure Statement merely states that "the mortgage market was frozen" and "the [PSA] could not close due to Covid." Disclosure Statement ¶¶ 7, 12. The Disclosure Statement also provides that the "Purchaser projects that it won't be able to close until approximately November 2020." *Id.* at ¶ 8.

15.     Acquisition's two-sentence explanation as to why the Purchaser was not able to consummate the Sale prepetition is not adequate, and does not provide Senior Lender and

other creditors enough information to make a determination on the viability of the Sale on a go-forward basis.  Stating that the Sale was not consummated "due to Covid" does not allow creditors make a reasoned determination as to the Purchaser's financial ability to close the Sale if approved as the highest and best bidder for the Mortgaged Property, let alone its willingness to bid for the Mortgaged Property at all.  *See, e.g.*, *In re Bermuda Bay, L.L.C.*, 2009 Bankr. LEXIS 4215 at *17, 22 (Bankr. E.D. Va. 2009) (conditioning approval of disclosure statement upon, among other things, providing information as to the financial stability of the entity that was to provide exit financing in connection with plan).

16.    The Disclosure Statement also fails to provide adequate information with respect to the current status of the PSA, which appears to have been in default or expired in accordance with its terms well prior to the Petition Date, based upon a "time of the essence" provision that required the sale of Mortgaged Property by no later than May 21, 2020.  *See* PSA § 2.1.  Acquisition's Plan is premised upon the assumption of the PSA but the PSA is non-assumable due to its failure to have closed by the relevant date, *see In re Empire Equities Capital Corp.*, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009).  The Disclosure Statement utterly fails to provide creditors with information as to whether the Purchaser has waived the time of the essence provision and is willing to purchase the Mortgaged Property for at least $18 million, whether under the PSA or any amendment or superseding agreement that also cures or waives the other apparent breaches of the PSA.[2]  *See generally In re Civitella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981) (denying approval of disclosure statement for failure to disclose factual information in connection with sale of debtor's sole real estate asset); *see also In re Copy Crafters*

---

[2] For example, the PSA required the Purchaser to provide the Down Payment by no later than February 27, 2020.  *See* PSA § 2.2.1.  As previously described, there is no evidence that Acquisition is currently holding the Down Payment, or whether it was ever provided in the first place.  The PSA also includes a representation by Acquisition that it has not filed for bankruptcy relief.  PSA § 12.1.16.

*Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y 1988) (denying approval of disclosure statement and noting, among other things, the potential unenforceability of attached sale agreement and that "the Court is reluctant to approve a Disclosure Statement premised upon… a speculative sale").

17.      Since the PSA was executed approximately five months prior to the Petition Date, it also does not provide for or contemplate a bankruptcy sale process.  The Disclosure Statement, in turn, fails to provide any information regarding the Purchaser's commitment to go forward with a bankruptcy auction and sale process, which will subject to PSA to higher and better offers.  The PSA in its current form does not allow Acquisition to seek higher and better offers, and in fact obligates Acquisition to close the Sale upon the Purchaser satisfying certain closing conditions, without providing Acquisition the right terminate in the event a higher and better offer is received. *See generally* PSA § 6.2. Without more information regarding the Purchaser's commitment to a bankruptcy sale process and its status as a potential stalking horse bidder, creditors cannot make a reasoned determination as to the viability of the Plan.

## II.      <u>Improper Quantification of Senior Lender's Claim</u>

18.      The Disclosure Statement improperly describes Senior Lender's secured claim at the $5,250,000 principal amount under the Senior Loan.  As of the Petition Date, Senior Lender was owed $6,378,750, a substantially higher amount, as set forth in Senior Lender's recently filed Proof of Claim.  Post-petition interest continues to accrue under the Senior Loan at the post-default rate, as well as Senior Lender's post-petition reimbursable fees and expenses, all of which will be part of Senior Lender's secured claim to the extent allowed pursuant to section 506(b) of the Bankruptcy Code.  The Disclosure Statement should reflect

this.  The failure to accurately disclose the amount of secured creditor claims can render a

disclosure statement inadequate and its corresponding plan "patently unconfirmable." *See,*

*e.g.*, *In re Moshe*, 567 B.R. 438, 444-47 (Bankr. E.D.N.Y. 2017); *In re Rosenblum*, 2019 Bankr.

LEXIS 2278 at 14-17, 2019 WL 578589 (Bankr. D. Nev. 2019) (denying approval of

disclosure statement based upon miscalculation of claims against debtor and lack of adequate

information provided in connection with such claims).

### III.    Inadequate Information Regarding Means for Plan's Implementation

19.    The Disclosure Statement does not provide satisfactory information regarding

*how* the plan will be implemented and the timing of such implementation, raising serious

doubts as to its feasibility.  Courts in various jurisdictions have found that the failure to

adequately disclose facts relating to the implementation of a plan is grounds for disapproval

of the disclosure statement.  *See, e.g, In re McGoey*, 2011 Bankr. LEXIS 1716 at *10 (Bankr.

N.D. Cal. 2011) (noting various deficiencies in disclosure statement, including that the

"feasibility of the Plan is not adequately discussed."); *In re Adana Mortgage Bankers, Inc.*, 14

B.R. 29, 31 (Bankr. N.D. Ga. 1981) ("[t]he Disclosure Statement does not provide any

information relevant to the risks of the Creditors under the terms and provisions of Debtor's

Plan. Such information relating to feasibility of Debtor's Plan is a proper part of a disclosure

statement in this case."); *Official Committee of Unsecured Creditors v. Michelson*, 141 B.R. 715,

718-19 (Bankr. E.D. Cal. 1992) ("every plan of reorganization must 'provide adequate means

for the plan's implementation.' Similarly, every disclosure statement needs an explanation of

why the proposed means of implementation will be adequate to the task.").

20.    Here, the Disclosure Statement does not provide adequate information with

respect to (i) the timing of any sale, and whether such sale is anticipated to occur before or

after a confirmation hearing on the Plan, or even the effective date of the Plan, (ii) whether

the PSA is a stalking horse bid and whether the Purchaser has agreed to subject the PSA to

higher and better offers at an auction, (iii) the timing and process by which Acquisition will

market and advertise the Mortgaged Property, (iv) the deadline for submitting bids and the

timing of any auction in the event multiple qualified bids are received, and (v) the ability of

Senior Lender to credit bid at the auction.  The Disclosure Statement merely provides that

the Purchaser "projects" that it *may* be able to close the Sale in November.  That, of course,

assumes that Purchaser or a third-party bidder, let alone a higher and better bidder, seeks to

purchase the Mortgaged Property.

21.    Without further information regarding the sale process generally, including the

approval of a sale in the context of the Plan, creditors will not be able to make an informed

decision with respect to the Plan.  The paucity of Acquisition's disclosures with respect to the

timing and process of the sale of the Mortgaged Property renders it inadequate.

### IV.    Plan is Patently Unconfirmable

22.    Senior Lender further submits that the Court should deny the approval of the

Disclosure Statement because the underlying Plan upon which it is based is patently

unconfirmable.  If a plan is patently unconfirmable on its face, a court may deny approval of

the disclosure statement, as the disclosure of information on such plan and subsequent

solicitation of votes would be futile.  *See, e.g.*, *In re Moshe*, 567 B.R. at 444; *In re 266 Washington

Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.); *In re Filex*, 116 B.R. 37, 41 (Bankr. S.D.N.Y.

1990).  If a chapter 11 plan is clearly not confirmable, "courts will not subject the estate to the

expense of the vote solicitation and plan confirmation process.  In such circumstances,

therefore it is 'incumbent upon the [c]ourt to decline approval of the disclosure statement and

prevent diminution of the estate.'" *Moshe*, 567 B.R. at 444 (quoting *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986)).  Further, since Acquisition's Plan is not confirmable and since Acquisition's sole asset is subject to the Stay Relief Motion, the Court should deny approval of the Disclosure Statement and instead grant Senior Lender relief from the automatic stay, which remains the most cost-effective and expeditious means for administering the Mortgaged Property.  *See In re 266 Washington Ave Assoc.*, 141 B.R. at 276, 288 (denying approval of disclosure statement and approving secured creditor's request for relief from automatic stay, which relief was premised upon non-confirmability of plan).

23.     Acquisition's Plan is patently unconfirmable on its face because the Plan contemplates the assumption of the PSA, which cannot be assumed.  As discussed in the Stay Relief Motion and as set forth above, the PSA was subject to a time-of-the-essence provision requiring closing by May 21, 2020, which has long since passed and had passed as of the Petition Date.  The failure to close constitutes a material, non-monetary default under the APA, and as such, Acquisition cannot assume the PSA because it cannot cure the breach of the time-of-the-essence provision.   Since the PSA cannot be assumed and the Plan incorporates and hinges upon the PSA, the Plan cannot be confirmed.

24.     In addition, even if the PSA was capable of assumption, the Plan is still not confirmable because it does not recognize Senior Lender's the right to credit bid in the amount of its secured claims pursuant to section 363(k) of the Bankruptcy Code.  The Bid Procedures, through the form asset purchase agreement attached thereto, states that all bids for the Mortgaged Property must be submitted as all-cash offers, and also require a down-payment and subsequent payment in cash of the balance at closing.  *See* Bid Procedures, Form APA § 2.01(A)-(C).

## **CONCLUSION**

25.    WHEREFORE, Senior Lender respectfully requests that this Court enter an order that (i) denies the approval of the Disclosure Statement, and (ii) grants Senior Lender such additional relief as deemed just and appropriate.

Dated:    October 2, 2020
New York, New York

By:    /s/ Joshua I. Divack
**HAHN & HESSEN LLP**
Joshua I. Divack, Esq.
Zachary G. Newman, Esq.
Jacob T. Schwartz, Esq.
Jose A. Fernandez, Esq.
488 Madison Avenue
New York, NY 10022
(212) 478-7200

*Counsel for DB 232 Seigel LLC &*
*DB 232 Seigel Mezz LLC*